# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 20, 2016

## STATE OF TENNESSEE v. DEWAYNE D. FLEMING

**Appeal from the Criminal Court for Sumner County**
**No. 8522012 Dee David Gay, Judge**

_____

**No. M2015-01774-CCA-R3-CD – Filed May 23, 2017**

_____

Defendant, Dewayne D. Fleming, was indicted for one count of aggravated burglary, two counts of especially aggravated kidnapping, one count of aggravated rape, and two counts of aggravated robbery. Defendant was convicted by a jury as charged. The trial court sentenced Defendant to six years for the aggravated burglary conviction; 12 years for each aggravated robbery conviction; 25 years for the aggravated rape conviction; and 25 years for each of the two especially aggravated kidnapping convictions. The trial court found Defendant to be a dangerous offender and imposed partial consecutive sentencing. The court ordered Defendant's aggravated robbery sentences to run concurrently with each other and his especially aggravated kidnapping sentences to run concurrently with each other. However, the court ordered that Defendant's sentences for aggravated robbery, especially aggravated kidnapping, and aggravated rape run consecutively, for an effective sentence of 62 years. In this appeal as of right, Defendant asserts that: 1) the evidence was insufficient to support his convictions because the accomplice testimony was uncorroborated; 2) the trial court erred by instructing the jury on theories of criminal liability that were not included in the indictment; 3) Defendant's convictions for especially aggravated kidnapping violate due process because the State failed to establish that the confinement was greater than necessary to commit the other felonies; and 4) the trial court erred in imposing consecutive sentencing. Having reviewed the entire record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick G. Frogge, Nashville, Tennessee, for the appellant, Dewayne D. Fleming.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Lawrence Ray Whitley, District Attorney General; Lytle Anthony James and Tara Wyllie, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Facts*

Defendant was indicted along with a co-defendant, Emonnie Branch, for the offenses that arose from a home invasion in which the male victim, B.H., was tied up, kicked, and robbed, and his wife was repeatedly raped. A third co-defendant, Mitchell Beverly, agreed to testify against Defendant at trial.

Mitchell Beverly testified that he participated in the home invasion, robbery, and rape of the victims on June 12, 2012. He testified that he met Defendant and Branch shortly before the offenses occurred. Beverly testified that he had a drug problem. He told Defendant that he thought they could rob the victims, who were renting a home from Beverly's parents. Beverly had the keys to the home. The three men met at the home of Cortez McClellan. Branch's girlfriend, Jessica Merritt, and Keith Pride, McClellan's roommate, were also present. Beverly testified that he, Defendant, and Branch drove to the victims' home in Merritt's grandmother's car, a black Dodge Neon, because Beverly's truck had expired tags. Beverly testified that they did not have a plan and they "were just kind of winging it[.]"

Beverly stayed in the car, parked approximately 50 to 75 yards away from the victims' home, while Defendant and Branch entered the home. Branch was armed with a BB gun, and Defendant had a flashlight. They both wore gloves and "doo-rags" around their faces. Beverly waited "a really long time" for Defendant and Branch to return. Defendant returned to the car and told Beverly to move the car. Beverly parked the car in the victims' driveway, and Branch ran outside carrying a flat-screen television. Beverly helped Branch load the television into the car, and Defendant went back inside the house to retrieve more items. Defendant returned with some bags "full of stuff." Defendant and Branch also took another large television. The men put both televisions in the backseat of the car because they would not fit inside the trunk. Beverly had to lie down on top of the televisions, and the screen on the larger television cracked from the weight of his body.

During the drive back to McClellan's house, Branch "bragged about raping [the female victim]." Defendant stated that he had kicked B.H. in the head during the robbery. They unloaded the car at McClellan's house and began "to divvy it up between everybody." Beverly testified that he "got a gold wedding band and a laptop computer."

2

Defendant "got a Nikon camera with a telephoto lens on it." The following day, Beverly and Branch sold the camera to a pawn shop. On cross-examination, Beverly acknowledged that he lied to the police after his arrest on June 19, 2012. He testified that Defendant and Branch told him to stay in the car.

Jessica Merritt testified that she remembered going to McClellan's house in June with Branch. They drove her grandmother's Dodge Neon. McClellan, Pride, Defendant, and Beverly were also there. Merritt had taken prescription medication, and she fell asleep on the couch at McClellan's house. She testified that Branch woke her up to borrow her car keys, and she fell asleep again. Branch told her that he was going to drive Defendant to Defendant's girlfriend's house. Merritt woke up sometime after dark and saw Defendant, Branch, Beverly, and McClellan carrying a television inside. Merritt could not recall details of the event at trial or if the television screen was cracked. She testified, "I've tried to put all this behind me, and I mean, it's all a blur to me. I mean, I don't remember." She acknowledged that she told police that the television had a crack in it. She acknowledged that some of the victims' stolen property was found at her home. She testified that Branch had brought it there. Merritt testified that she did not "see how it would be possible" for an adult and two large televisions to fit into the backseat of her grandmother's car.

Detective Ron Brawner, of the Sumner County Sheriff's Department, investigated this case. He interviewed the female victim at the hospital. A rape kit was collected, and the DNA obtained from the rape kit matched Branch. Detective Brawner traced the serial numbers of some of the stolen items and found that they had been pawned by Beverly. Detective Brawner interviewed Beverly. Beverly gave several inconsistent statements and minimized his involvement. Detective Brawner confronted him with evidence of cell phone records that identified his location during the incident, and Beverly gave his account of what happened. Beverly told Detective Brawner that they had trouble getting both televisions into the backseat of the vehicle and one of the screens cracked when he fell on it. Detective Brawner testified that another detective measured the backseat of the vehicle and determined that it was "[j]ust barely" possible to fit two televisions inside.

Detective Brawner also interviewed Cortez McClellan and Keith Pride. Detective Brawner interviewed Jessica Merritt, and she told him that she had seen the men carrying a television with a cracked screen into the house. Detective Brawner testified that Beverly denied having a key to the victims' residence. Beverly admitted that he gave the key to Defendant and Branch after Detective Brawner told him he had found the key on Beverly's key ring. Detective Brawner acknowledged that one of the victims testified at the preliminary hearing that Branch used the name "Demetrius" in referring to the other intruder. Detective Brawner was never able to connect anyone with that name to the crime. Detective Branch testified that the Dodge Neon was never processed for evidence.

3

Detective Christian Booth went to McClellan's home on June 15, 2012. McClellan, Defendant, and Pride were present. Detective Booth saw several large televisions in the living room. One of the televisions had a cracked screen, and another television was on the floor, unplugged. He also did a "phone scan" on Branch's phone and found a photograph of one of the televisions.

The male victim, B.H., testified that on the night of June 12, 2012, at approximately 10:30 p.m., his wife woke him and told him that two men were inside their home. He woke up and saw two African-American men standing in his bedroom. They had "flashlights and a gun [and were] ordering [him] to get out of bed." One was wearing a light-colored shirt, and the other was wearing a dark-colored shirt, and they were both wearing baseball caps and had bandanas covering their faces. B.H. testified that the men were "both average build, not very big," and they "looked like kids." They demanded that the victim give them a rope, and he told them that he did not have a rope. The men used a bed sheet to tie B.H.'s hands behind his back. The victim asked the men not to hurt his two children, who were also inside the house. The men told him that they would not hurt the children as long as the victims did whatever they asked. One of the men demanded that the victim give them his guns, drugs, and money, and the victim told them that he did not have any of those. The victim told him that he had $50 in his wallet in the kitchen. The man could not find the victim's wallet, and he returned to the bedroom and threatened to kill the victim. The victim told him his wallet might be in his shorts. B.H. could hear his wife being raped by one of the men in the bathroom. He tried to get up, and the other man kicked him in the head. The men "ripped the TV off [the] wall in the bedroom." The men also took another television, a laptop, gaming system, and they took the wedding rings off both victims' fingers.

B.H. testified that he saw Defendant, Beverly, and Branch at the preliminary hearing. He testified that Beverly "was very tall and slender, and [Defendant] and Branch were short and stocky." He testified that Beverly's build did not match either of the intruders. B.H. identified Branch as the person who raped his wife. He testified that he could not identify Defendant as the other individual in his home.

A.H., the other victim, testified that that she had "very poor vision." She testified that she heard their dogs barking on the night of the intrusion, and a few moments later, she saw two men in her bedroom. She testified that the men told her they would not hurt their children if the victims did what the men told them to do. One of the men removed their wedding rings from the victims' fingers and tied B.H's hands using a bed sheet. The other man said, "'[y]ou finish tying him up while I rape this one real quick.'" He held a gun to A.H.'s head and walked her into the hallway. He opened the door to her daughter's room and then closed it. He took her into the bathroom and pushed her

4

against the wall and vaginally raped her. He told her to call him, "Daddy." He then ordered her to get into the bathtub and wash her vagina. She could hear both men "running through the house." The same man who raped her returned to the bathroom and asked her what his name was, and she responded, "Daddy." "[A]fter some time had passed," he returned to the bathroom again and ordered her to perform oral sex on him. He threatened to "blow [her] head off" if she bit his penis. He ordered her to get back into the bathtub. He returned a third time and ordered A.H. to sit on him, and he raped her vaginally again. He then ordered her to bend over, and he raped her anally. He then raped her orally again, and he told B.H., "'[y]our wife gives good head. You should compliment her more.'" A.H. was worried that her children would wake up. She could hear the men "ransacking [their] house." The same man returned to the bathroom and raped A.H. again. She heard the men rummaging around the house and removing things from the house. She then heard them drive away. A.H. testified that she could not identify Defendant as the second intruder "because he had on – intruder number two had on a bandana that covered his face entirely and a hat pulled down low and a flashlight in [her] face."

Cortez McClellan testified for the defense. He testified that he lived with Keith Pride in a duplex apartment. McClellan knew Defendant and Branch from high school. He testified that he and Defendant were friends, and McClellan had promised Defendant's mother to keep him out of trouble. He testified that he knew Beverly, but he did not like him "[b]ecause he's fake." McClellan testified that he played basketball with Defendant on the day of the incident. They returned to McClellan's apartment, and McClellan, Defendant, and Pride fell asleep. Branch arrived at McClellan's apartment, and he was carrying Jessica Merritt. McClellan testified that Merritt was "out of it." He never saw Merritt awake that night. When McClellan awoke, he saw Branch and Beverly carrying a television inside. McClellan thought that Branch was bringing his belongings into the apartment to leave there because "he had got[ten] put out at his dad's house[.]" McClellan noticed that the screen was cracked. He testified that neither he nor Pride helped carry anything into the apartment. McClellan testified that he did not hear any discussions between Defendant, Beverly, and Branch about planning a robbery. He testified that he did not receive any of the items stolen from the victims' home. McClellan testified that Branch and Beverly told him after they returned that they had robbed a home and that Branch had raped the woman who lived there.

McClellan gave two statements to the police. He testified that he never told police that Defendant had left his apartment that night. He told police that Branch and Beverly left the apartment. McClellan testified, "I'll tell you like I told [the detectives]. When I went to sleep, [Defendant] was there on my couch. I woke up; he's still sitting there on my couch with the exact same clothes on." He testified that when he told Detective Brawner that "they" left his apartment, he was referring to Branch and Beverly. He

acknowledged that he told Detective Brawner that he was asleep when Branch, Beverly, and Defendant left his apartment. McClellan admitted that he did not know if Defendant left with Branch and Beverly because he was asleep.

Defendant did not testify or present any other witnesses.

*Sentencing hearing*

At the sentencing hearing, a presentence report and victim impact statements were admitted as exhibits. A.H. testified, "[a]t that exact moment [that the intruders entered her house] every single thing about my life changed forever. I can hardly put into words how you've destroyed our lives." She testified that she was "killed that night." She testified that she suffered from post-traumatic stress disorder (PTSD) as a result of the incident. She testified that she and her husband "had a nice life" before the incident and that Defendant "dragged us out of bed, pointed guns at us, threatened our children, tied [B.H.], and did nothing to stop Emonnie Branch from raping [her] over and over, nothing at all." She testified that she thought Defendant was "going to kill" her family. She testified that she was "just a shell of the person [she] used to be, now crippled by PTSD." She told Defendant, "[y]ou stole so much more from us than our things that night. You stole our kids' parents. You stole my life. You stole their mother, and I hate you for that."

Defendant's mother testified that she raised Defendant and his sister as a single mother. She testified that he was "a great kid." She testified that Defendant "was a B and C student" and that he played sports. She testified that he was a "very popular guy." Defendant graduated from high school, and he did not get into trouble often. She testified that she was "a strict mom" and disciplined Defendant when he did get into trouble. She testified that Defendant "planned on going to college" and that he had wanted to become a policeman since he was nine-years-old. She testified that she had never met Emonnie Branch. She testified that Defendant "would not have done anything like that."

Clotee Carter testified that her son and Defendant were best friends, and she had known Defendant since he was in fourth grade. She testified that she was also a single mother, that she was Defendant's "family," and that the family was very supportive of each other.

The trial court heard arguments from counsel and considered the evidence presented at trial and the sentencing hearing, the presentence report, and the principles of sentencing. The trial court stated,

6

I've heard facts now at the sentence[ing] hearing and trial and I am never – I never cease to be amazed at man's inhumanity to man, and that's what we've got in this particular case.

Human beings do not need to be treated the way this husband and wife were. And as we heard today, it's almost a death sentence for both of them.

The trial court noted that Defendant kicked B.H. in the head when B.H. tried to aid his wife, who was being raped by Branch.

Regarding consecutive sentencing, the trial court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court found, "[t]his crime was committed by two dangerous offenders coming in with a weapon, tying up innocent victims in their home, raping repeatedly the woman, kicking the head of the man who must hear what goes on, helping themselves to anything and everything that appears to have value. This is a dangerous offender." The trial court also found that confinement was necessary "to protect society from the defendant's unwillingness to lead a productive life and the defendant resorts to criminal activity in furtherance of his anti-social lifestyle."

*Analysis*

*Sufficiency of the evidence*

Defendant was convicted for the offenses of aggravated burglary, two counts of especially aggravated kidnapping, one count of aggravated rape, and two counts of aggravated robbery. Defendant does not challenge the sufficiency of the evidence to support any particular element of the offenses for which he was convicted. Rather, Defendant contends that there was insufficient evidence to corroborate the testimony of co-defendant Beverly. The State contends that the evidence was sufficient.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of

7

the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)); *State v. Robinson*, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). This principle has been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. *State v.*

*Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). The jury determines "the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient 'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" *Anderson*, 985 S.W.2d at 16 (quoting *Clapp v. State*, 30 S.W. 214, 217 (Tenn. 1895)).

In ruling on Defendant's motion for judgment of acquittal, the trial court noted that the corroboration in this case was "about as thin as it gets." The trial court concluded, however, that there was sufficient evidence to corroborate Beverly's testimony. Specifically, the trial court pointed to the victim B.H.'s testimony that one of the intruders was a light-skinned African-American male with an average build. B.H. also testified that he observed Beverly, Branch, and Defendant at the preliminary hearing and that "Beverly was very tall and slender, and both Branch and Defendant were short and stocky." B.H. testified that Beverly's body type did not match either of the intruders. The trial court concluded, "I find that this testimony and this testimony alone corroborates the testimony of the accomplice in this case."

Defendant asserts that "the only evidence in the record that implicates [Defendant] is the testimony of Mitchell Beverly." The State argues that "the totality of the record provides sufficient corroboration."

Taken in the light most favorable to the State, the evidence shows that Defendant was present at McClellan's apartment immediately before and after the incident occurred. Merritt and McClellan both testified that Defendant was at McClellan's apartment, along with the other two defendants, on the night of the offenses. Beverly testified that he had to squeeze into the backseat of the vehicle with the stolen televisions because he was the third passenger, and his position in the vehicle caused one of the television screens to crack. A jury could reasonably conclude that one of the television screens was broken because there were three men in the vehicle. Merritt testified that she saw Defendant, Branch, Beverly, Pride, and McClellan carry a television inside the apartment that night. McClellan testified that he saw Beverly and Branch carrying a television with a broken screen inside. Detective Booth went to McClellan's apartment three days after the incident, and he saw a television set with a broken screen. Defendant was present at McClellan's apartment at that time. Beverly testified that Defendant told him he kicked B.H. in the head. B.H. testified that the light-skinned African-American male kicked him in the head when he tried to intervene in the rape of his wife. B.H. testified that Beverly's body type did not match either of the intruders. The DNA of the rapist matched Branch; therefore, the jury could reasonably conclude that Defendant was the other intruder. Beverly testified that Merritt's Dodge Neon was used in the crimes. Merritt testified that Branch woke her up at McClellan's apartment and told her he needed the keys to the vehicle to give Defendant a ride to Defendant's girlfriend's home.

9

McClellan could not confirm or deny that Defendant did not leave with Branch and Beverly during the time they were committing the offenses.

We reiterate, "[o]nly slight circumstances are required to furnish the necessary corroboration." *State v. Little*, 402 S.W.3d 202, 212 (Tenn. 2013). We conclude that there was enough evidence from which the jury could determine that the testimony of Beverly was sufficiently corroborated. Defendant is not entitled to relief on this issue.

*Jury instructions*

Defendant contends that the trial court erred by charging the jury on alternative elements of the crimes of especially aggravated kidnapping and aggravated rape. The State asserts that any error in the jury instructions was harmless because the State made clear in its closing argument that it was relying on the element of use of a deadly weapon.

In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The material elements of the charged offense should be described and defined in connection with that offense. *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn. 2000); *State v. Cravens*, 764 S.W.2d 754, 756 (Tenn. 1989). A criminal defendant denied a correct and complete charge of the law is deprived of the constitutional right to a jury trial, which subjects the erroneous jury instruction to a constitutional harmless error analysis. *Garrison*, 40 S.W.3d at 433-34. Because the right is constitutional in nature, the State bears the burden of showing the deprivation of this right is harmless beyond a reasonable doubt. *Momon v. State*, 18 S.W.3d 152, 167 (Tenn. 1999). Moreover, an error affecting a constitutional right is presumed reversible, and such error will result in reversal of the conviction unless the State shows beyond a reasonable doubt that the error did not prejudice the outcome of the trial. *State v. Ely*, 48 S.W.3d 710, 725 (Tenn. 2001).

Defendant contends that the trial court's instructions to the jury were "confusing enough to entertain multiple theories of guilt." This court has instructed that "when a statute contains different ways to commit the offense it proscribes, the instruction given to the jury should be limited to the precise offense alleged in the charging instrument to the exclusion of the remaining theories." *State v. Bowman*, 327 S.W.3d 69, 94 (Tenn. Crim. App. 2009).

The indictment in this case alleges that Defendant, by means of criminal responsibility, penetrated the victim by using force, and that he was armed with an article used to lead her to reasonably believe it to be a weapon. A person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." T.C.A. § 39-11-401, Sentencing Comm'n Cmts. A person is criminally responsible for

the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). As charged in this case, "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by the victim . . . [and] [f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]" T.C.A. § 39-13-502(a)(1).

The trial court instructed the jury to find Defendant guilty of aggravated rape if it found the elements alleged in the indictment, "that force or coercion was used to accomplish the act, and the defendant was armed with a weapon or any article used or fashioned in a manner to lead the alleged victim reasonably to believe it to be a weapon," or if it found the following alternative elements of the crime that were not charged in the indictment: that the victim suffered bodily injury, or that Defendant was aided or abetted by others and force or coercion was used or Defendant knew or had reason to know that the victim was mentally defective, mentally incapacitated or physically helpless. See T.C.A. § 39-13-502(a)(2)-(3). At the hearing on Defendant's motion for new trial, the court appeared to concede that it "did over-instruct a little bit," but noted no objections from counsel. The court ruled, "I don't see any error from those instructions."

We note that the Tennessee Supreme Court, interpreting Rule 30(b) of the Tennessee Rules of Criminal Procedure, has held that a defendant's right to challenge an erroneous jury instruction is not waived by his failure to make an objection at trial. *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn.1996). The defendant may still raise the issue in a motion for new trial. *Id*. Here, Defendant raised the issue in his motion for new trial.

In its brief, the State cites to the record and asserts that its closing argument "made clear that the State was relying on the element of use of a deadly weapon or anything that could be construed to be a deadly weapon." In its rebuttal argument, the State argued that B.H.'s restraint was more than was necessary to establish especially aggravated kidnapping, and that his confinement was to facilitate the rape of A.H. In the context of this argument, the prosecutor stated:

> First of all, ladies and gentlemen, why did [B.H.] even have to be tied up? You've got guys that come in here with guns. They at least think it's a gun. Could they not have done this robbery if they'd just herded them, taken their cell phones, taken the rings, as they did, and herded them into the bathroom and given them the appropriate threats, like "If

11

you come out of there, we're going to kill you; if you come out of there, we're going to kill your children; if you come out of there" – whatever you're going to do.

This is the only mention in the State's closing argument about the use of a deadly weapon as an element of the offenses. Nevertheless, because the evidence presented was legally sufficient to support the convictions, and because the prosecution argued only the elements alleged in the indictment and did not argue or present proof of the alternative elements of the offenses, it is unlikely that the jury instruction error, standing alone, misled the jury and prejudicially affected the judgment or the judicial process. We conclude that any error the trial court committed in instructing the jury on the alternative elements of the aggravated rape offense did not adversely affect the outcome of the trial. Our conclusion here is similar to a previous holding in which we affirmed a defendant's aggravated rape conviction where the defendant was indicted under the "use of a deadly weapon" theory, the other two theories were also presented to the jury, and the evidence produced at trial only supported the defendant's guilt according to the theory under which he was indicted. *See State v. Larry Brown*, No. 89-53-III, 1989 WL 98080, at *4-5 (Tenn. Crim. App., at Nashville, Aug. 25, 1989). We therefore conclude, as we did in *Larry Brown*, that the trial court's instruction regarding the other aggravating factors not charged in the indictment, "was surplusage and did not affect the outcome of the trial." *Id*. at *5.

Defendant also argues that the jury charge impermissibly lowered the State's burden of proof by allowing the jury to convict the Defendant upon a finding of a merely "reckless" sexual penetration. The State concedes that the trial court erred in instructing the jury that all the elements of the offense of aggravated rape, which involves a nature of conduct crime, are satisfied by a culpable mental state of recklessness but maintains that the error was harmless.

A panel of this court has held that when the charged offense is aggravated rape, which involves a nature of conduct crime, it is error for the trial court "to charge the mental state definition of 'reckless' with respect to the element of sexual penetration." *State v. Anthony J. Fulmer*, No. M2008-01206-CCA-R3-CD, 2010 WL 681395, at *4 (Tenn. Crim. App., Feb. 26, 2010), *no perm. app. filed*. This court has also held that when "[t]here are no facts presented at trial under which the jury could have possibly concluded that the penetration of the victim by the appellant was reckless," such error does not affect the verdict. *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005).

Even if this panel were to conclude that the jury instructions with regard to mental culpability were erroneous in this case, in our view the error would be harmless beyond a

12

reasonable doubt. Defendant's co-defendant, Branch, announced that he was going to rape the victim. He raped A.H. multiple times, instructing her to call him "Daddy," and telling B.H. that his wife "gives good head." The evidence was sufficient to prove intentional penetration, the prosecution argued only intentional penetration, and proof of reckless penetration was never presented. The jury instruction neither misled the jury nor prejudicially affected the judgment. *See also State v. Robert Allen Zaloba*, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at \*23-24 (Tenn. Crim. App., Dec. 26, 2012), *perm. app. denied* (Tenn., April 10, 2013); *State v. Johnny Lynn*, No. M2008-00532-CCA-R3-CD, 2009 WL 1812419, at \*5 (Tenn. Crim. App., June 25, 2009), *perm. app. denied* (Tenn., Sept. 1, 2009). Defendant is not entitled to relief on this issue.

*Due process considerations*

Defendant contends that his convictions for aggravated rape, aggravated robbery, and especially aggravated kidnapping violate due process because the State was unable to prove that the removal and confinement of the victims was greater than necessary to commit the other offenses under *State v. White*, 362 S.W.3d 559 (Tenn. 2012). The State responds that there is sufficient evidence to support a finding that both victims' restraint was not incidental to the accompanying felonies. We agree with the State.

In *State v. White*, our supreme court addressed due process considerations affecting convictions for kidnapping and an accompanying felony such as robbery, rape, or assault. The holding of *White* "was intended to address the due process concerns that arise when a defendant is charged with kidnapping a victim and other crimes, such as robbery, rape, or assault, that involve some inherent confinement of that victim." *State v. Teats*, 468 S.W.3d 495, 503 (Tenn. 2015). The *White* court held:

> [T]he legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

*White*, 362 S.W.3d at 562. The court determined that the proper inquiry for the jury is "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.* at 578. The court further set forth the following jury instruction:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the

13

State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

• the nature and duration of the victim's removal or confinement by the defendant;

• whether the removal or confinement occurred during the commission of the separate offense;

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*White*, 362 S.W.3d at 580-81. The standard of review is the same as that for reviewing the sufficiency of the evidence: whether there was any evidence, viewed in the light most favorable to the State, from which the jury could infer that the State met its burden of proof in showing that the victims' restraining was not incidental to the accompanying felonies. *Id.* at 562.

The record reflects that the trial court gave the *White* jury instruction. The State asserts that the restraint of the victims was not incidental to the crimes of aggravated robbery and aggravated rape and was sufficient to support separate convictions for especially aggravated kidnapping. We agree. The duration of each of the victims' confinement was longer than necessary to commit the robbery and rapes. A.H. testified that the home invasion lasted a long time. When she was not being raped, she heard the intruders walking around and in and out of the house. Beverly testified that he waited in the car a "really long time" before Defendant came outside and directed him to move the

14

car into the victims' driveway. Additionally, Beverly testified that while they were loading the stolen property into the vehicle, they lost the car keys and spent time looking for them.

The victim B.H.'s hands were tied, and he was prevented from trying to aid his wife or calling the police. The jury could have found that the aggravated robbery could have been completed without tying him up. Defendant could have held both victims at gunpoint while the aggravated robbery was completed. The jury could also have found that B.H.'s restraint was longer than necessary to rob the home, but was instead for the purpose of raping his wife. Defendant could have held A.H. at gunpoint to accomplish the aggravated robbery. The jury could have found that B.H.'s restraint permitted Branch to rape A.H. multiple times. A.H.'s restraint was also more than was necessary to complete the offense of aggravated robbery or aggravated rape. When he was not raping her, Branch demanded that A.H. remain in the bathtub while he and Defendant walked around the house.

From this evidence, we conclude that Defendant's convictions for aggravated rape, aggravated robbery, and especially aggravated kidnapping do not violate due process. Defendant is not entitled to relief on this issue.

*Consecutive sentencing*

Defendant contends that the trial court abused its discretion by finding him to be a dangerous offender and imposing partial consecutive sentencing. The State maintains that the trial court acted within its discretion in finding that Defendant was a dangerous offender and ordering consecutive sentences. We agree with the State.

In imposing consecutive sentences, the trial court found that Defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The trial court found:

> This crime was committed by two dangerous offenders coming in with a weapon, tying up innocent victims in their own home, raping repeatedly the woman, kicking the head of the man who must hear what goes on, helping themselves to anything and everything that appears to have value. This is a dangerous offender.

Additionally, the trial court found that confinement for an extended period of time was necessary to protect society from Defendant's unwillingness to lead a productive life and that Defendant resorted to criminal activity in furtherance of an anti-social lifestyle.

15

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Likewise, the "standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of the seven statutory bases for imposing consecutive sentences delineated in Tennessee Code Annotated section 40-35-115(b). *Id*. at 861.

Tennessee Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). When the trial court bases its decision to run sentences consecutively on the dangerous offender category in Tennessee Code Annotated section 40-35-115(b)(4), it must make additional findings as set out in *State v. Wilkerson*: that the aggregate sentence is "'reasonably related to the severity of the offenses'" and "'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)). If the trial court fails to make the requisite findings, the appellate court may either conduct a de novo review to determine whether there is an adequate basis for the imposition of consecutive sentences or remand to the trial court so that it may consider the appropriate factors and make the proper findings. *Id*. at 864.

Here, the trial court made extensive findings about the seriousness of the offenses, noting the cruelty of the crimes and the lasting effect it had on the victims. Additionally, the trial court found that the sentence was necessary to protect the public from further criminal acts. Specifically, the trial court "consider[ed] the victim[s] here and what they had to go through and deterring others from breaking into the sanctity of one's home and abusing them physically and mentally to where there are lifetime consequences." The court also considered that Defendant committed the offenses while on probation for statutory rape. The trial court noted that Defendant expressed no remorse and the trial court stated, "[l]et the record reflect that the defendant is not listening to anything that I say and he appears not to give a rip about anything. That's the way he's been throughout this entire hearing."

Additionally, we note that Defendant was on probation at the time of the offenses in this case. See T.C.A. § 40-35-115(b)(6). Accordingly, even if the trial court erred by imposing consecutive sentencing based on its "dangerous offender" finding, another statutory ground exists to support the trial court's imposition of consecutive sentencing.

16

The trial court made the requisite findings under Tennessee Code Annotated section 40-35-115(b)(4) and *Wilkerson*, and we accordingly grant the trial court's findings a presumption of reasonableness. *See Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). The trial court properly considered the purposes and principles of sentencing during the hearing, and it imposed partial consecutive sentences after finding that the statutory requirements were met. There is nothing in the record to show that the trial court abused its discretion. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE